UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

**CIVIL ACTION NO. 4:11CV-00141-JHM**

**DAROL & KAREN RODROCK**                                                              **PLAINTIFFS**

**VS.**

**AMY GUMZ and**
**GUMZ FARMS QUARTER HORSES, LLC.**                                      **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on a motion by Defendants, Amy Gumz and Gumz Farms Quarter Horses, LLC, to dismiss Counts 2, 3, 4, and 5 of the Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(6) [DN 11]. Fully briefed, this matter is ripe for decision.

**I. BACKGROUND**

Plaintiffs, Darol and Karen Rodrock (hereinafter "Rodrocks"), entered into Stallion Management Agreements with Defendant, Gumz Farm Quarter Horses, LLC ("Gumz Farms"), to govern the care, management, promotion, and breeding of four stallion horses. Defendant, Amy Gumz, is a member of Gumz Farm Quarter Horses, LLC. The stallions, named *Huntin For Chocolate, Only in the Moonlite,* and *Certain Potential* are registered Quarter Horses, and *Scenic Impulse* is a registered Paint horse. The most recent Stallion Management Agreement was entered into on April 18, 2011.

Under the Stallion Management Agreement, Gumz Farms undertook to manage, promote, and oversee the breeding of the stallions which includes the collection, freezing, and storage of semen. In exchange, Gumz Farms is paid for those services, any expenses associated with the stallions, and a "chute" fee, which is a fee associated with each mare bred to the stallions. In addition to monetary compensation and reimbursement, Gumz Farms receives one free breeding per

year to each stallion and one breed to each stallion for every ten mares bred to that stallion by Plaintiffs. Under the Stallion Management Agreement, Gumz Farms was required to make and file accurate breeding reports with the American Quarter Horse and other affiliated Quarter Horse and Paint Horse Associations. Further, Gumz Farms also charged the Rodrocks monthly for expenses associated with the stallions. The invoices averaged $15,000 to $20,000 per month.

On February 1, 2011, the Rodrocks and Amy Gumz entered a Horse Interest and Maintenance Agreement (hereinafter "Partnership Agreement") whereby the Rodrocks transferred a one-half interest in ten mares to Gumz individually in exchange for "services, care, and maintenance" of the mares provided by Gumz. Specifically, the Partnership Agreement provided that Gumz would care for the mares, including all costs of breeding the mares, and the Rodrocks would provide the mares and the semen from the Rodrock stallions. Any third-party expenses and all income from the Partnership Agreement would be split equally. Upon cancellation of the contract, Gumz was required to transfer the partnership horses back to the Rodrocks. Gumz Farms agreed to be bound by the terms of the Agreement.

Plaintiffs claim that during the summer of 2011 they became aware that Gumz was breeding her and her farm's mares to the Rodrock stallions without payment. Based on this and other information, the Rodrocks removed their stallions, a non-partnership mare, and some of the stored semen in September of 2011. Plaintiffs assert that at this time Gumz withdrew from the Partnership Agreement with respect to the mares. Plaintiffs filed this Complaint on November 10, 2011, asserting the following claims against Gumz Farms and Gumz: (1) declaratory judgment regarding breach of contracts, (2) conversion, (3) fraud, (4) negligent misrepresentation, (5) negligence, (6) breach of contracts, (7) beach of the implied covenant of good faith and fair dealing, (8) breach of

fiduciary duty, (9) statutory agency disclosure violation, and (10) unjust enrichment /*quantum meruit*.

Defendants now move to dismiss the claims for conversion, fraud, negligent misrepresentation, and negligence pursuant to Fed. R. Civ. P. 12(b)(6) arguing that these claims are precluded by the economic loss rule in light of Giddings & Lewis, Inc. v. Industrial Risk Insurers, 348 S.W.3d 729 (Ky. 2011).

## II. STANDARD OF REVIEW

Upon a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), a court "must construe the complaint in the light most favorable to plaintiff," League of United Latin Am. Citizens v. Bredesen, 500 F.3d 523, 527 (6th Cir. 2007) (citation omitted), "accept all well-pled factual allegations as true[,]" id., and determine whether the "complaint states a plausible claim for relief[,]" Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Under this standard, the plaintiff must provide the grounds for its entitlement to relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A plaintiff satisfies this standard only when it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. A complaint falls short if it pleads facts "merely consistent with a defendant's liability" or if the alleged facts do not "permit the court to infer more than the mere possibility of misconduct." Id. at 678-679. Instead, the allegations must "'show[ ] that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## III. DISCUSSION

**A. Economic Loss Rule**

"The 'economic loss rule' prevents the commercial purchaser of a product from suing in tort to recover for economic losses arising from the malfunction of the product itself, recognizing that such damages must be recovered, if at all, pursuant to contract law." Giddings & Lewis, Inc. v. Industrial Risk Insurers, 348 S.W.3d 729, 733 (Ky. 2011). In other words, "the rule 'prohibits purchasers of products from recovering purely economic damages under most tort theories.'" Grace v. Armstrong Coal Co., Inc., 2009 WL 366239, *4 (W.D. Ky. Feb.13, 2009) (quoting HDM Flugservice GmbH v. Parker Hannifin Corp., 332 F.3d 1025, 1028 (6th Cir. 2003)). Although the economic loss rule has been applied to cases involving Kentucky law on multiple occasions, the Kentucky Supreme Court did not formally adopt the economic loss rule until Giddings & Lewis, Inc. v. Industrial Risk Insurers. In so doing, the Kentucky Supreme Court held that "the economic loss rule applies to claims arising from a defective product sold in a commercial transaction, and that the relevant product is the entire item bargained for by the parties and placed in the stream of commerce by the manufacturer." Id. at 733 See Francis v. Armstrong Coal Reserves, Inc., 2012 WL 777271 (W.D. Ky. Mar. 7, 2012); Lewis v. Ceralvo Holdings, LLC, 2012 WL 32607 (W.D. Ky. Jan. 6, 2012).

Defendants argue that Plaintiffs' claims for conversion, fraud, negligence, and negligent misrepresentation are barred by the economic loss rule. The Court disagrees. First, contrary to Defendants' argument, Giddings is limited to "claims arising from a defective product sold in a commercial transaction." Giddings, 348 S.W.3d at 733. The Kentucky Supreme Court's holding in Giddings is consistent with the assessment of the economic loss rule in Louisville Gas and Elec.

Co. v. Continental Field Sys., Inc., 420 F. Supp. 2d 764, 769 (W.D. Ky. 2005). As observed by the court in Louisville Gas and Elec. Co.,

> Typically, the [economic loss] rule "operates at the intersection of products liability remedies in tort and contractual remedies under the Uniform Commercial Code. Id. It provides that a party to a contract may not sue in tort to recover a purely economic loss caused to the product itself or as a direct consequence of the damaged product. Id. at 577; . . . Thus, the economic loss rule prevents recovery in tort for damage to the product and consequential economic losses arising from damage to that product. Id."

Id. at 768-769 (citing to Ohio Casualty Ins. Co. v. Vermeer Mfg. Co., 298 F. Supp. 2d 575, 578 (W.D. Ky. 2004)). Thus, "[v]irtually every classic description of the economic loss rule pertains to and often limits its application to the sale of products [in order to] . . . preserve the distinction between the remedies available under the U.C.C. and those available in tort." Id. at 769. It is undisputed that these claims do not arise from the sale of a defective product sold in a commercial transaction, and therefore, the economic loss rule does not apply.

Second, even examining only pre-Giddings case law, the Court rejects the Defendants' attempt to expand the economic loss rule to any "business purchase" or any "commercial transaction." Over the last ten years, federal courts charged with the task of applying Kentucky law have stated that "Kentucky courts would limit the application of the economic loss rule to products liability cases, business purchases cases, and construction cases." Brewer Mach. & Conveyor Mfg. Co., Inc. v. Old National Bank, 248 F.R.D. 478, 481–82 (W.D. Ky. 2008) (collecting cases including Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845, 849 (6th Cir. 2002)). The Court is aware that a few district courts have relied on the "business purchase" language located in Mt. Lebanon, 276 F.3d at 849, to suggest that economic loss rule applies to all contracts involving commercial transactions. See, e.g., Highland Stud Internatinoal v. Baffert, 2002

5

WL 34403141 (E.D. Ky. May 16, 2002). However, Mt. Lebanon does not support such a broad application of the economic loss rule. In an effort to predict Kentucky's application of the economic loss rule in light of Real Estate Marketing, Inc. v. Franz, 885 S.W.2d 921 (Ky. 1994), the Sixth Circuit in Mt. Lebanon reaffirmed its previous holding that the Kentucky Supreme Court would adopt the economic loss rule "in a product liability action based upon negligence," but limited the application of the economic loss rule to only business product purchases, as a opposed to consumer product purchases. 276 F.3d at 848-849 (also holding that the building itself, not the component parts, is the product for purposes of the economic loss doctrine).

Finally, the Court declines to expand the economic loss rule to service or employment contracts. In Louisville Gas and Electric Co., the defendants argued that the economic loss rule should be extended to services contracts. 420 F. Supp.2d at 768. In determining whether such an expansion of the rule should be allowed, Judge John Heyburn noted the "conceptual difficulty of applying the economic loss rule to services." Id. at 769. He found that the cases addressing the economic loss rule in Kentucky attempted to "preserve the distinction between the remedies available under the U.C.C. and those available in tort[, but] [s]uch a distinction would be immaterial here because the U.C.C. does not govern services." Id. Ultimately, Judge Heyburn found nothing to suggest that Kentucky courts were likely to expand the economic loss rule in such a fashion. Id. at 769-770; see also Grace v. Armstrong Coal Co., Inc., 2009 WL 366239, *4 (W.D. Ky. Feb.13, 2009) (finding that the economic loss rule does not apply to employment contracts); Brewer, 248 F.R.D. at 481 (W.D. Ky. 2008) (refusing to apply the economic loss rule to the account contract between Plaintiff and its bank).

Both the Stallion Management Agreement and the Partnership Agreement appear to be

service and/or employment contracts. Under the Stallion Management Agreement, Gumz Farms undertook to manage, promote, and oversee the breeding of the four Rodrock stallions in exchange for the payment of fees. Similarly, under the Partnership Agreement, Gumz undertook to provide "services, care, and maintenance" of ten Rodrock mares in exchange for a partial interest in those mares and their offspring. Because the economic loss rule does not apply to service or employment contracts, the tort claims are not barred in this matter.

For these reasons, the Court concludes that the economic loss rule does not apply to the present case.

### B. Independent Legal Duty

"[W]here a contract exists, a tort claim may only be maintained on the basis of a legal duty that is 'separate and distinct from the contractual obligation.'" Lewis, 2012 WL 32607, *5(quoting Consolidated Rail Corp. v. Grand Trunk Western R.R. Co., 2009 WL 3460334, *6 (E.D. Mich. Oct.22, 2009)). In other words, "'[t]he failure to perform a contractual obligation typically does not give rise to a cause of action in tort. . . . However, if a plaintiff can establish the existence of an independent legal duty, he may maintain an action in tort even though the acts complained of also constitute a breach of contract.'" Mims v. Western–Southern Agency, Inc., 226 S.W.3d 833, 836 (Ky. Ct. App. 2007)(quoting Jones v. Hartford Life and Accident Ins. Co., 443 F. Supp. 2d 3, 5 (D. D.C. 2006)). See also First Const., LLC v. Gravelroad Entertainment, LLC, 2008 WL 2038878, *5 (E.D. Ky. May 12, 2008); Francis v. Nami Resources Co., LLC, 2008 WL 852047, *13–14 (E.D. Ky. Mar. 28, 2008). The parties have not addressed this authority in their briefs.

To the extent that Plaintiffs argue that the conduct of Gumz Farms and Gumz exceeded or breached the Stallion Management Agreement or the Partnership Agreement respectively, any

conversion, fraud, negligence, and negligent misrepresentation claims based upon these allegations would be barred pursuant to the above authority.  However, the Stallion Management Agreement appears to be solely between Gumz Farms and the Rodrocks.  Amy Gumz signed on behalf of Gumz Farm as a member of the limited liability company.  She does not appear to be a party to the contract individually.  Therefore, the tort claims against Amy Gumz related to the four Rodrock stallions do not arise from the Stallion Management Agreement and are instead based on the existence of an independent legal duty.  To the extent that the Plaintiffs also raise claims related to the sale of yearling colts and non-partnership mares that are not related to the Stallion Management Agreement or the Partnership Agreement, the tort claims are based on the existence of an independent legal duty.  Absent a separate contract between the parties regarding these colts or mares, the independent legal duty doctrine would not bar these claims.

At this stage of the litigation and because the parties have not addressed this line of authority, the Court declines to dismiss the conversion, fraud, negligence, or negligent misrepresentation claims based on the independent legal duty test.  The parties may revisit this issue at the close of discovery, if necessary.

## IV.  CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the motion by Defendants to dismiss [DN 11] is **DENIED**.

cc: counsel of record

8